**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| ALAN LANE FEUERBACHER, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 4:11-CV-272 |
| | § | |
| CHRISTOPHER J. MOSER, | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM AND ORDER

Pending before the court is Alan Lane Feuerbacher's ("Feuerbacher") appeal from the

Judgment of the United States Bankruptcy Court, entered March 21, 2011, in which final judgment

was granted in favor of Appellee Christopher J. Moser ("Trustee" or "Bankruptcy Trustee") as

to the Trustee's claims brought pursuant to 11 U.S.C. §§ 544(b) and 548.  Having reviewed the

judgment, the record, the submissions of the parties, and the applicable law, the court is of the

opinion that the bankruptcy court's decision should be affirmed.

I.     <u>Background</u>

On October 6, 2009, Billie M. Feuerbacher ("Billie") filed a voluntary petition for relief

under Chapter 7 of the United States Bankruptcy Code in the Eastern District of Texas.  *See In

re Billie M. Feuerbacher*, No. 09-43180.  Billie's husband, Feuerbacher, did not seek bankruptcy

relief.

On November 9, 2009, the Bankruptcy Trustee filed an adversary proceeding in the

bankruptcy court against Feuerbacher to avoid and recover two transfers of real estate Billie made

to her husband before she filed for bankruptcy.  *See Moser v. Feuerbacher*, Adv. No. 09-04198.

The bankruptcy judge ruled in favor of the Trustee, holding that the transfers of Billie's interests

in both properties were avoidable as fraudulent transfers under § 548 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE § 24.001 *et seq.*

A.     The Adversary Proceeding

The facts presented to the bankruptcy court in the adversary proceeding, excerpted from the parties' Joint Pretrial Order and the bankruptcy court's Findings of Fact and Conclusions of Law, dated February 10 and 11, 2011, respectively, are as follows:

1.     The Homestead Property

At all times relevant to this case, Billie and Feuerbacher lived at 7012 Nicki Street, Dallas, Collin County, Texas 75252 (the "Homestead Property"). Both individuals claimed a homestead exemption as allowed by state law.

2.     The Mills County Property

On May 3, 2001, the Feuerbachers jointly acquired approximately 241 acres of non-homestead real property in Mills County, Texas (the "Mills County Property"), by Warranty Deed With Vendor's Lien. They executed a Promissory Note, dated May 11, 2001, in the original principal amount of $242,000.00 payable to the order of Capital Farm Credit, FLCA (the "Mills County Property Note"), which evidenced a loan that was used to purchase the property. The deed of trust was recorded in the real property records of Mills County on May 21, 2001.

The following payments were made to Capital Farm Credit on the Mills County Property Note from an account held jointly by the couple: (a) $14,298.76 on December 1, 2003, and (b) $17,993.53 on November 26, 2008. On December 2, 2005, Billie made a payment to Capital

Farm Credit on the Mills County Property Note from an account held solely in her name in the amount of $17,641.55.

### 3.   The Colorado Property

On February 1, 2002, Billie and Feuerbacher jointly acquired a non-homestead house in Mineral County, Colorado (the "Colorado Property"), by Warranty Deed, which was recorded in the real property records of Mineral County on February 13, 2002.

The Feuerbachers executed a deed of trust on February 1, 2007, in the original principal amount of $375,000.00 payable to EverHome Mortgage Company (the "Colorado Property Note"), which evidenced a loan that was used to refinance the Colorado Property.[1]  The deed was recorded in the real property records of Mineral County on February 27, 2007.   Eighteen payments, totaling more than $40,000.00, were made on the Colorado Property Note from 2007 through 2009 from an account held jointly by the Feuerbachers.

### 4.   Pre-Petition Lawsuits Against Billie

T.S. Printing filed a lawsuit against Billie in Dallas County Court at Law No. 4 on August 12, 2005.[2]  The county court's docket report indicates that this lawsuit remained pending through the date of Billie's bankruptcy filing on October 6, 2009; however, in an amended statement of financial affairs, dated October 12, 2009, Billie stated that a judgment (amount undetermined) had been filed.  A copy of the judgment was not made part of the record.

---

[1] EverHome Mortgage Company later assigned the Colorado Property Note and the deed of trust granting a lien on the Colorado Property to Wells Fargo Home Mortgage.

[2] In its Finding of Facts and Conclusions of Law, the bankruptcy court recites that this lawsuit was filed in Dallas County Court at Law No. 5; however, the Trustee's trial exhibit No. 10 states that the lawsuit was filed in Dallas County Court at Law No. 4.

On October 27, 2008, Valuable Investments LLC, filed a lawsuit against Billie in the 40th Judicial District Court of Ellis County, Texas.  A month later, on November 26, 2008, David Allen Guerra filed suit against Billie in the same court.  Both lawsuits remained pending through the date of Billie's bankruptcy filing on October 6, 2009.

On May 6, 2009, TBW Land & Cattle, LLC, obtained a judgment against Billie for more than $4.2 million in the 40th Judicial District Court of Ellis County, Texas.  That judgment remained in effect through the date of her bankruptcy filing on October 6, 2009.

5.     The Partition Agreements and Equity Values of the Properties

On July 19, 2003, Billie executed a document entitled Release and Conveyance of Properties of Billie Morse Feuerbacher (the "Debtor Release and Conveyance"), which stated that she revoked all claim to the Mills County Property and the Colorado Property and gifted and conferred any and all of her community property interest in those properties to Feuerbacher.  In addition, the Debtor Release and Conveyance stated that the Mills County Property and the Colorado Property would be her husband's separate property and that the Homestead Property would be her separate property.

The same day, Feuerbacher executed a document entitled Release and Conveyance of Properties of Alan Lane Feuerbacher (the "Appellant Release and Conveyance"), which stated that he revoked all claim to the Homestead Property and gifted and conferred any and all community property interest in the Homestead Property to Billie.  The Appellant Release and Conveyance also stated that the Homestead Property would be Billie's separate property and that the Mills County Property and the Colorado Property would be Feuerbacher's separate property.

4

The Debtor Release and Conveyance was first recorded in Mills County on September 16, 2009, at which time the fair market value of the Mills County Property was $590,000.00.  The balance owed on the property was $222,306.60; therefore, the equity value of the Mills County Property on that date was $367,693.40.

On September 23, 2009, Billie executed a Quit Claim Deed conveying her interest in the Colorado Property to Feuerbacher.  The deed was recorded in the real property records of Mineral County the same day.  As of September 23, 2009, the fair market value of the Colorado Property was $438,000.00, and the balance owed on the note was $363,163.69.  Thus, the equity value on the Colorado Property on that date was $74,836.31.

As of September 16 and 23, 2009, the fair market value of the Homestead Property was approximately $325,582.00, and the balance of the loan secured by a lien on the property was approximately $323,840.88.[3]  Therefore, the equity value of the Homestead Property on those dates was $1,741.12.

6.   Billie's Insolvency

According to the information provided in her bankruptcy schedules, Billie had total assets of $366,305.00 on the date she filed for bankruptcy.  In her statement of financial affairs, Billie swore under penalty of perjury that her transfers during the ninety days preceding the bankruptcy filing date totaled less than $50,000.00.

Further, Billie had liabilities exceeding $4.2 million at all times during the ninety days leading up to and including the bankruptcy filing date.  Indeed, according to Schedule F (Creditors

---

[3] Billie was not an obligor on the loan for the Homestead Property with the current or previous lender.

Holding Unsecured Non-Priority Claims), Billie owed an undisputed debt of $4,241,438.01 to TBW Land & Cattle LLC on the date of her bankruptcy filing based on the judgment rendered against her five months earlier.

Billie's liabilities, therefore, were more than the value of her assets at all times during the ninety days leading up to and including the bankruptcy filing date, excluding the Mills County Property and the Colorado Property.  Even including these properties, Billie's liabilities exceeded the value of her assets during that time period.

7.    The Bankruptcy Court's Rulings and Final Judgment

On February 10, 2011, the parties submitted the case to the bankruptcy judge on the facts stated in the Joint Pretrial Order and trial exhibits admitted into evidence by agreement.  No witness testimony was offered at trial, either live or by deposition.

The bankruptcy judge entered Findings of Fact and Conclusions of Law on February 11, 2011, ruling in favor of the Trustee.  Specifically, the bankruptcy judge determined the following:

a.    The "transfers" of Billie's interests in the Mills County Property and the Colorado Property to Feuerbacher for purposes of § 548 of the Bankruptcy Code and TUFTA occurred on September 16, 2009, and September 23, 2009, respectively, when the conveyance documents were recorded in each county's property records.

b.    The Mills County Property and the Colorado Property were jointly managed community property of Billie at the time of the transfers.

c.    The Trustee had standing to pursue avoidance of both transfers under 11 U.S.C. § 544(b)(1) and TUFTA.

d.    Both transfers were avoidable as constructively fraudulent transfers under § 548 of the Bankruptcy Code because Billie received less than reasonably equivalent value in exchange for the transfers and was insolvent at the time of the transfers.

6

e. The transfer of Billie's interest in the Mills County Property was avoidable as a constructively fraudulent transfer under TUFTA because she received less than reasonably equivalent value in exchange for the transfer and was insolvent at the time of the transfer.

f. The transfer of Billie's interest in the Colorado Property was avoidable as a constructively fraudulent transfer under TUFTA because she received less than reasonably equivalent value in exchange for the transfer and was insolvent at the time of the transfer.

g. Both transfers were avoidable as actual fraudulent transfers under § 548 of the Bankruptcy Code and TUFTA because Billie made the transfers with the actual intent to hinder, delay, or defraud one or more of her creditors.

h. An award of attorney's fees and expenses to the Trustee was appropriate under TUFTA.

The parties agreed to present the issue of attorney's fees and expenses by separate motion, response, and affidavits of counsel.  Therefore, the Trustee filed a motion to recover attorney's fees and expenses on February 15, 2011.  Feuerbacher did not object or otherwise respond to the Trustee's motion.  As a result, the bankruptcy court entered an order on March 21, 2011, granting the Trustee's request.  The same day, a final judgment avoiding both transfers and awarding the Trustee attorney's fees and expenses totaling $26,436.65 pursuant to TUFTA was entered against Feuerbacher.  Following the entry of final judgment, the Trustee sold both the Mills County and Colorado Properties after obtaining permission from the bankruptcy court in June 2011.

B. The Appeal

On March 31, 2011, Feuerbacher filed a notice of appeal from the bankruptcy court's final judgment pursuant to 28 U.S.C. § 158.  On appeal, Feuerbacher argues that the bankruptcy court's final adjudication of the Trustee's fraudulent transfer claims in the underlying case was unconstitutional in light of the United States Supreme Court's recent decision, *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011).  Feuerbacher also challenges the bankruptcy court's

7

application of TUFTA, including its award of attorney's fees pursuant to that statute.  Specifically, he asserts that, with respect to the Colorado Property, Colorado, rather than Texas, law governs the Trustee's claim under § 544(b).  Lastly, Feuerbacher argues that the bankruptcy court erred in finding both property transfers avoidable as actually fraudulent.

In response, the Trustee contends that:  (1) the bankruptcy court had constitutional authority to enter a final judgment in this case; (2) Feuerbacher waived his assertion that Colorado, rather than Texas, law applies; (3) the subsequent sale of the Mills County and Colorado Properties renders Feuerbacher's arguments regarding choice of law and actual fraud moot; (4) the bankruptcy court's alternative finding that the property transfers were avoidable as constructively fraudulent renders Feuerbacher's argument that the court erroneously avoided the transfers as actually fraudulent moot; (5) the bankruptcy court properly applied TUFTA to avoid the transfer of Billie's interest in the Colorado Property and award attorney's fees; and (6) record evidence supports the conclusion that Billie made the transfers of both properties with the actual intent to hinder, delay, or defraud one or more of her creditors.

II.    Analysis

A.    Jurisdiction and Constitutional Authority to Enter a Final Judgment

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges.  28 U.S.C. § 158(a).  Pursuant to 28 U.S.C. § 158(c)(2), an appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts . . . ."

8

Under 28 U.S.C. § 1334, district courts have original, but not exclusive, jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C. § 157(a), bankruptcy proceedings are divided into three categories: (1) those that "aris[e] under title 11"; (2) those that "aris[e] in" a title 11 case; and (3) those that are "related to a case under title 11." 28 U.S.C. § 157(a). Under § 157, district courts may refer all such proceedings to the bankruptcy judges of their district, who may then enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(a), (b)(1). Section 157(b)(2) lists sixteen categories of core proceedings, including "proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. § 157(b)(2)(H). In non-core proceedings, a bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court." 28 U.S.C. § 157(c)(1).

During the pendency of this appeal, the Supreme Court issued its decision in *Stern*, which discussed a bankruptcy court's constitutional authority to enter final orders on certain core matters. 131 S. Ct. at 2606-20. The *Stern* case involved protracted litigation over the estate of Texas oil tycoon J. Howard Marshall ("Marshall") between the estates of his surviving spouse, Vickie Lynn Marshall, better known as Anna Nicole Smith ("Vickie"), and E. Pierce Marshall, Marshall's son ("Pierce"). *Id.* at 2601.

Shortly before Marshall's death, Vickie filed suit in a Texas probate court alleging that Pierce fraudulently induced his father to sign a living trust agreement excluding Vickie from receiving any portion of Marshall's estate. *Id.* The Texas court rejected Vickie's claim, ruling in favor of Pierce. *Id.* at 2601-02. With her state action pending, Vickie filed for bankruptcy protection in the Central District of California. *Id.* Pierce then filed a complaint and proof of

claim in the bankruptcy court alleging that Vickie had defamed him. *Id.* at 2601. Vickie responded with a counterclaim seeking damages for Pierce's alleged tortious interference with Marshall's promise to give Vickie a large portion of his property. *Id.*

Following a bench trial, the bankruptcy court ruled in favor of Vickie, awarding her compensatory and punitive damages. *Id.* On appeal, the United States Court of Appeals for the Ninth Circuit held that the bankruptcy court lacked authority to enter judgment on Vickie's counterclaim, finding that the counterclaim, based solely on state law, was not a core proceeding. *Id.* at 2602. The Supreme Court affirmed the Ninth Circuit on different grounds, concluding that, while the bankruptcy court had the statutory authority to issue a final judgment on Vickie's counterclaim because it was a "core" proceeding under the plain text of § 157(b)(2)(C) (stating that core proceedings include "counterclaims by the estate against persons filing claims against the estate"), it lacked the constitutional authority to decide the state law counterclaim. *Id.* at 2604-20.

Importantly, although the Supreme Court held that the bankruptcy court lacked the constitutional authority to adjudicate Vickie's counterclaim, it noted that the bankruptcy court did have subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(C). *See Stern*, 131 S. Ct. at 2607. The Court explained that the allocation of authority set forth in § 157 "to enter final judgment between the bankruptcy court and the district court . . . does not implicate questions of subject matter jurisdiction." *Id.*; *accord In re Refco, Inc.*, 461 B.R. 181, 184 (Bankr. S.D.N.Y. 2011) (rejecting the notion that *Stern* disturbs a bankruptcy court's subject matter jurisdiction over core matters); *In re Soporex, Inc.*, 463 B.R. 344, 362 n.4 (Bankr. N.D. Tex. 2011) ("*Stern* clarified bankruptcy courts' constitutional power, not their subject matter jurisdiction."); *In re Universal Mktg., Inc.*, 459 B.R. 573, 577 (Bankr. E.D. Pa. 2011) ("*Stern* does not affect the

exercise of federal bankruptcy jurisdiction. . . ."); *In re Wilderness Crossings, LLC*, Adv. No.

11-80417, 2011 WL 5417098, at *1 (Bankr. W.D. Mich. Nov. 8, 2011) (same).

The Supreme Court, in a five-to-four decision, asserted numerous reasons for its holding

that the bankruptcy court lacked the constitutional authority to adjudicate Vickie's counterclaim.

As noted by Justice Scalia's concurring opinion:

> there are at least seven different reasons given in the Court's opinion for
> concluding that an Article III judge was required to adjudicate this lawsuit: that it
> was one "under state common law" which was "not a matter that can be pursued
> only by grace of the other branches," *ante*, at 27; that it was "not 'completely
> dependent upon' adjudication of a claim created by federal law," *ibid.*; that "Pierce
> did not truly consent to resolution of Vickie's claim in the bankruptcy court
> proceedings," *ibid.*; that "the asserted authority to decide Vickie's claim is not
> limited to a 'particularized area of the law,'" *ante*, at 28; that "there was never any
> reason to believe that the process of adjudicating Pierce's proof of claim would
> necessarily resolve Vickie's counterclaim," *ante*, at 32; that the trustee was not
> "asserting a right to recovery created by federal bankruptcy law," *ante*, at 33; and
> that the Bankruptcy Judge "ha[d] the power to enter 'appropriate orders and
> judgments'—including final judgments—subject to review only if a party chooses
> to appeal," *ante*, at 35.

*Stern*, 131 S. Ct. 2621.

Application of the aforementioned rationales to the case at bar reveals that *Stern* does not

preclude the bankruptcy court from issuing a final judgment on claims where, as here, the Trustee

seeks to recover fraudulent transfers. *See In re Refco*, 461 B.R. at 187. First, the Trustee's

fraudulent transfer claims against Feuerbacher—unlike the counterclaim in *Stern*—flow directly

from a federal statutory scheme; namely, 11 U.S.C. §§ 544(b) and 548. *Id.*; *see In re Kaiser*, 722

F.2d 1574, 1582 (2d Cir. 1983) ("This [fraudulent conveyance] action is inextricably tied to the

creation of the estate in bankruptcy for the benefit of [the debtor's] creditors; there would be no

cause of action without the federal bankruptcy statutes that authorize it."); *In re Custom

Contractors, LLC*, 462 B.R. 901, 907 (Bankr. S.D. Fla. 2011) (fraudulent transfer claims under

§§ 544 and 548 "would not exist but for the bankruptcy"); *In re Universal Mktg., Inc.*, 459 B.R. at 576 (holding that a fraudulent conveyance claim brought pursuant to § 544 is a federal bankruptcy cause of action, not a "state law action independent of the federal bankruptcy law") (emphasis omitted).   Logically, therefore, such claims are "completely dependent upon adjudication of a claim created by federal law." *In re Refco*, 461 B.R. at 187 (quoting *Stern*, 131 S. Ct. at 2614); *accord In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314, 319 (Bankr. D. Del. 2011) (describing fraudulent transfer claims as "relat[ing] entirely to matters integral to the bankruptcy case").   In addition, "the adjudication of fraudulent transfer claims in a bankruptcy context is a particularized area of the law . . . because of the place such litigation often takes in the overall case and the familiarity of bankruptcy courts not only with the Bankruptcy Code's fraudulent transfer scheme but also with how such cases are developed, paid for, litigated and resolved in the multi-party bankruptcy context, which differs significantly from the two-party state law setting." *In re Refco*, 461 B.R. at 187 (internal quotations and citations omitted).

Furthermore, as one court has recognized, "the pursuit of avoidance claims has been 'a core aspect of the administration of bankrupt estates since the 18th century, . . . [and] tied to, if not solely based on, the bankruptcy courts' 'principally *in rem* jurisdiction.'" *In re Refco*, 461 B.R. at 187 (quoting *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 369-73 (2006)); *see also In re French*, 440 F.3d 145, 151 (4th Cir.), *cert. denied*, 549 U.S. 815 (2006).   Indeed, "[s]ince the enactment of the Bankruptcy Code, the management and determination of statutory avoidance claims has been a primary function of the bankruptcy courts.   Such claims often play a prominent role in bankruptcy cases, either because of their sheer numbers or because of the effect that the potential avoidance of a transfer, lien or obligation may have on creditors' recoveries." *In re*

12

*Refco*, 461 B.R. at 187 (also opining that the "ability to manage efficiently the investigation and litigation of such claims, and their possible global settlement, decreases if handled on a piecemeal basis by different judges, no matter how talented").

Despite the above-mentioned differences between this case and the state law tortious interference claim in *Stern*, some courts have concluded that bankruptcy courts lack constitutional authority to adjudicate fraudulent conveyance actions based on *Stern*'s reliance on two prior Supreme Court decisions, *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). *See, e.g., Adelphia Recovery Trust v. FLP Grp., Inc.*, No. 11CIV6847, 2012 WL 264180, at *5 (S.D.N.Y. Jan. 30, 2012); *In re Innovative Commc'n Corp.*, Adv. No. 08–3004, 2011 WL 3439291, *3 (Bankr. D.V.I. Aug. 5, 2011); *In re Blixseth*, Adv. No. 10-00088, 2011 WL 3274042, at *11 (Bankr. D. Mont. Aug. 1, 2011). In *N. Pipeline Constr. Co.*, the Supreme Court created a public rights exception permitting Congress to assign constitutionally certain cases involving public rights to non-Article III, legislative courts, such as the bankruptcy court. *Stern*, 131 S. Ct. 2597. *Stern* contrasted cases within the reach of the public rights exception—those "arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments'—and those that were instead matters 'of private right, that is, of the liability of one individual to another under the law as defined.'" *Stern*, 131 S. Ct. at 2597–98 (quoting *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932)). In *Granfinanciera*, the Court held that fraudulent conveyance and preferential transfer action defendants who had not submitted proofs of claim against the bankruptcy estate were entitled to a jury trial and, consequently, did not fall within the public rights exception. *Granfinanciera*, 492 U.S. at 56. In

13

concluding that Vickie's claim did not come within the public rights exception, the Court, citing *Granfinanciera*, stated that because "fraudulent conveyance suits were 'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res[,] . . . a fraudulent conveyance action is "more accurately characterized as a private rather than a public right." *Stern*, 131 S. Ct. at 2614 (quoting *Granfinanciera*, 492 U.S. at 55-56).

The *Stern* Court stated that the distinction in *Granfinanciera* "between actions that seek to 'augment the bankruptcy estate' and those that seek 'a pro rata share of the bankruptcy res,' reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case[.]" *Stern*, 131 S. Ct. at 2618 (emphasis in original). Although some courts view this language as limiting a bankruptcy court's authority to adjudicate fraudulent conveyance actions, others opine that the "Court's use of the word 'reaffirm' makes clear than nothing has changed." *In re Custom Contractors, LLC*, 462 B.R. at 907-08 (citing *In re Safety Harbor Resort & Spa*, 456 B.R. 703, 717 (Bankr. M.D. Fla. 2011)). As recognized by the court in *In re Custom Contractors, LLC*:

> Neither *Stern*, nor *Granfinanciera*[,] hold that bankruptcy courts lack authority to enter final judgments in fraudulent transfer actions. "In fact, the Supreme Court [in *Granfinanciera*] went to great lengths to emphasize that issue was not even before it in that case." *Id.* (citing *Granfinanciera*, 492 U.S. at 64 n.19, 109 S. Ct. 2782). Indeed, the "sole issue in *Granfinanciera* was whether the Seventh Amendment conferred on petitioners a right to a jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them." *Id.* Judge Williamson further noted in *Safety Harbor*, that "the language from *Granfinanciera* that some courts and commentators fear may limit bankruptcy courts' jurisdiction—language relied on by the *Stern* Court—has been the law for over twenty years." *Id.* Yet, neither Judge Williamson nor this Court is "aware

14

of a single case during the twenty years preceding *Stern* challenging a bankruptcy court's authority to enter final judgments in fraudulent conveyance actions." *Id.*

462 B.R. at 907-08. This view appears consistent with that of numerous other courts advocating a narrow interpretation of *Stern*. *See, e.g.*, *In re Civic Partners Sioux City, LLC*, No. 11-00829, 2012 WL 761361, at *8 (Bankr. N.D. Iowa Mar. 8, 2012); *In re Arbogast*, ___ B.R. ___, No. 10-2092, 2012 WL 390214, at *33-34 (Bankr. W.D. Pa. Feb. 7, 2012); *In re Direct Response Media, Inc.*, ___ B.R. ___, No. 10-10058, 2012 WL 112503, at *10 (Bankr. D. Del. Jan. 12, 2012); *In re Refco, Inc.*, 461 B.R. at 192; *Mercury Co., Inc. v. FNF Sec. Acquisition, Inc.*, 460 B.R. 778, 783-84 (D. Colo. 2011); *Kurz v. Emak Worldwide, Inc.*, 464 B.R. 635, 645 n.6 (D. Del. 2011); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. at 319.

Indeed, the *Stern* decision is "replete with language emphasizing that the ruling should be limited to the unique circumstances of that case. . . ." *In re Salander O'Reilly Galleries*, 453 B.R. 106, 115 (Bankr. S.D.N.Y. 2011); *see Stern*, 131 S. Ct. at 2620 (characterizing the opinion as "narrow," and holding that "Congress, in one isolated respect, exceeded [Article III's] limitation [on Congress' power] in the Bankruptcy Act of 1984" such that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim") (opining that the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction does not "meaningfully change[] the division of labor in the current statute") (stating that its decision "does not change all that much"); *accord In re Civic Partners Sioux City, LLC*, 2012 WL 761361, at *8 (describing *Stern's* holding as "very narrow"); *In re Arbogast*, 2012 WL 390214, at *33 (construing *Stern* "narrowly"); *In re Direct Response Media, Inc.*, 2012 WL 112503, at *10 (same); *In re Refco,*

15

*Inc.*, 461 B.R. at 191-92 (same); *Mercury Co., Inc.*, 460 B.R. at 783-84 (same); *Kurz*, 464 B.R. at 645 n.6 (same); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. at 319 (same).

In light of *Stern*'s limiting language, at least four other courts have held that bankruptcy courts may issue final judgments in fraudulent conveyance actions. *See In re Arbogast*, 2012 WL 390214, at *33 ("[T]his Court concludes that it possesses the constitutional authority to enter a final judgment in the Arbogast Fraudulent Transfer Action."); *In re Direct Response Media, Inc.*, 2012 WL 112503, at *11 (adopting a narrow interpretation of *Stern* and holding that the "fraudulent transfer claims arise . . . under Title 11 and in a case under Title 11 and are by definition "core" issues under [§ 157(b)(2)(H)] for which a bankruptcy court has authority to enter final adjudications."); *In re Refco, Inc.*, 461 B.R. at 192 (holding that "Article III of the Constitution does not prohibit the bankruptcy courts' determination of fraudulent transfer claims under 11 U.S.C. §§ 544 and 548 by final judgment"); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. at 319 (finding *Stern* inapplicable to avoidance actions).

Therefore, it appears that "*Stern* did not strike the entire structure in 28 U.S.C. § 157 allocating the division of authority into core and non-core proceedings." *In re Civic Partners Sioux City, LLC*, 2012 WL 761361, at *8. Indeed, aside from § 157(b)(2)(C), "*Stern* did not strike down or even address the other enumerated examples of core proceedings in § 157(b)(2)," including § 157(b)(2)(H), the section at issue here. *Id.* Consequently, the court finds that *Stern* did not preclude the bankruptcy court from adjudicating the Trustee's fraudulent conveyance claims brought pursuant to §§ 544(b) and 548.

Assuming *arguendo* that the bankruptcy court was without the constitutional power to enter a final judgment in this case, the vast majority of courts to confront the issue have concluded that

bankruptcy courts nonetheless have unquestioned authority to submit proposed findings and conclusions of law. *See, e.g.*, *In re Rothstein, Rosenfeldt, Adler, P.A.*, No. 11-62612, 2012 WL 882497, at *3 (S.D. Fla. Mar. 14, 2012) (collecting cases); *In re Containership Co. (TCC) A/S*, No. 11-12622, 2012 WL 443716, at *10 (Bankr. S.D.N.Y. Feb. 12, 2012); *In re Soporex, Inc.*, 463 B.R. at 364; *Kelly v. JPMorgan Chase & Co.*, 464 B.R. 854, 861 (D. Minn. 2011). Hence, whether this appeal is subject traditional standards of appellate review or the less deferential *de novo* review, the outcome remains the same.[4]

B.   Choice of Law

With regard to the Colorado Property, Feuerbacher challenges the propriety of the bankruptcy court's award of attorney's fees to the Trustee pursuant to his claim under 11 U.S.C. § 544(b). Specifically, Feuerbacher argues that the court incorrectly applied Texas, rather than Colorado, law. In response, the Trustee points out that Feuerbacher did not raise the issue in his trial brief or in the Joint Pretrial Order, which included the parties' agreement that "Texas laws determine property interests in this case." Feuerbacher neither contests this assertion nor identifies any place in the record where he preserved the argument for appeal. As a result, the choice of law issue is waived. *See Em'rs Ins. of Wausa v. Occidental Petroleum Corp.*, 978 F.2d

---

[4] In reviewing a decision of the bankruptcy court, Rule 8013 of the Federal Rules of Bankruptcy Procedure requires the court to accept the bankruptcy court's findings of fact unless clearly erroneous and to examine *de novo* the conclusions of law. *See Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 346 (5th Cir. 2008); *In re Soileau*, 488 F.3d 302, 305 (5th Cir. 2007); *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 517 (5th Cir. 2004); *In re Homeowners Mortg. & Equity, Inc.*, 354 F.3d 372, 375 (5th Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307-08 (5th Cir. 1985). A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *See Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 209 (5th Cir. 1983); *see In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003) (quoting *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003)). A "bankruptcy judge's findings of fact and conclusions of law [that] are construed as proposed findings and conclusions . . . receive *de novo* review." *In re Colony Beach & Tennis Club Ass'n, Inc.*, 454 B.R. 209, 215 (M.D. Fla. 2011).

1422, 1430 (5th Cir. 1992) (parties are bound by the theory of law they argued in the district court absent manifest injury); *Roth v. Mims*, 298 B.R. 272, 284 (N.D. Tex. 2003) (finding choice of law issue waived where it was "not adequately raised or brought to the bankruptcy court's attention in time to be properly considered, and the bankruptcy court did not did not err in failing to consider the issue").

Nevertheless, the bankruptcy court correctly applied Texas law in this case.  Section 544(b) of the Bankruptcy Code provides that a bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under *applicable law* by a creditor holding an unsecured claim. . . ."  11 U.S.C. § 544(b)(1) (emphasis added). "The Fifth Circuit has not ruled on whether bankruptcy courts should apply federal or state choice of law rules."  *In re Cyrus II P'ship*, 413 B.R. 609, 619 (Bankr. S.D. Tex. 2008); *accord In re Soporex, Inc.*, 446 B.R. 750, 761 (Bankr. N.D. Tex. 2011).  Specifically, it has not determined whether the federal choice of law rule—the independent judgment test—or the forum state's choice of law rules should be applied in bankruptcy actions brought pursuant to § 544(b).  *See In the Matter of Mirant Corp.* ("*Mirant*"), ___ F.3d ___, No. 11-10070, 2012 WL 919620, at *5 (5th Cir. Mar. 20, 2012) (citing *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981)).

With regard to fraudulent transfer actions brought pursuant to § 544(b), the Fifth Circuit has stated that such claims "sound in tort" and recognized that Texas courts apply "the 'most significant relationship' test as enunciated in Sections 6 and 145 of the Restatement (Second) of

Conflicts" to tort claims.[5]  *Mirant*, 2012 WL 919620, at *5 (citing *In re Cyrus II P'ship*, 413 B.R.

at 619) (opining that claim under § 544(b) to recover fraudulent conveyance of real property was

more "appropriately characterized as [a] tort action"); *Gutierrez v. Collins*, 583 S.W.2d 312, 318

(1979) (holding that Texas courts apply § 145 to tort claims)).   "Because the independent judgment

test 'is "essentially synonymous with the most significant relationship approach adopted by" the

Restatement (Second) Conflict of Laws,'" the court need not resolve which choice of law test

applies here.  *Mirant*, 2012 WL 919620, at *5 (quoting *In re Cyrus II P'ship*, 413 B.R. at 615

(quoting *In re Kaiser Steel Corp.*, 87 B.R. 154, 158 (Bankr. D. Colo. 1988)));  *accord In re*

*Soporex, Inc.*, 446 B.R. at 761.   Indeed, "Sections 6 and 145 of the Restatement (Second) of

Conflict of Laws . . . provide the appropriate analytical framework."  *Mirant*, 2012 WL 919620,

at *5; *In re Cyrus II P'ship*, 413 B.R. at 621 (holding that §§ 6 and 145 of the Restatement apply

to choice of law issues in § 544(b) actions to recover fraudulent transfers of real property).

---

[5] The court recognizes that § 223 of the Restatement (Second) generally applies to claims involving
the validity and effect of conveyances in land.  *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 223
(1971).  Section 223 states that "[w]hether a conveyance transfers an interest in land and the nature of the
interest transferred are determined by the law that would be applied by the courts of the situs.  These
courts would usually apply their own local law in determining such questions."  *Id*.  In this case, while the
"subject transfer is for real property, the issue is whether the transfer is fraudulent as to creditors" in the
context of a § 544(b) claim.  *See In re Cyrus II P'ship*, 413 B.R. at 616.  Because the "purpose of the
Bankruptcy Code's avoidance provisions . . . is to prevent debtors from illegitimately disposing of property
that should be available to their creditors," and because such claims "seek to achieve these goals by
rewinding injuries caused to the bankruptcy estate and its creditors by fraudulent conveyances," avoidance
actions under § 544(b) "are appropriately characterized as tort actions."  *Id*. at 619 (applying §§ 145 and
6 of the Restatement instead of § 223 to an allegedly fraudulent transfer of realty) (internal citations and
quotations omitted).  Moreover, in light of the Fifth Circuit's recent statement that "[a]voidance actions
pursuant to 11 U.S.C. § 544(b) sound in tort," it appears that §§ 145 and 6 contain the appropriate
analytical framework for the issues presented in this case.  *See Mirant*, 2012 WL 919620, at *5.

Section 6 of the Restatement sets forth several factors relevant to the choice of law analysis:

(a)     the needs of the interstate and international systems;
(b)     the relevant policies of the forum;
(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
(d)     the protection of justified expectations;
(e)     the basic policies underlying the particular field of law;
(f)     certainty, predictability and uniformity of result; and
(g)     ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971); *accord Mirant*, 2012 WL 919620, at *7 n.2.

Furthermore, Section 145 directs courts to consider:

(a)     the place where the injury occurred;
(b)     the place where the conduct causing the injury occurred;
(c)     the domicil, residence, nationality, place of incorporation and place of business of the parties; and
(d)     the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971); *accord Mirant*, 2012 WL 919620, at *7 n.2.  The factors set forth in § 145 should be analyzed first because they "provide the backdrop for the § 6 analysis." *Mirant*, 2012 WL 919620, at *5.  "When weighing the factors under [S]ection 145, 'it is not the number of contacts, but the qualitative nature of those particular contacts that determines which state has the most significant relationship to the occurrence and the parties.'" *In re Soporex, Inc.*, 446 B.R. at 763 (quoting *Asarco LLC v. Americas Mining Corp.*, 382 B.R. 49, 62 (S.D. Tex. 2007)).

In the case at bar, most of the factors under § 145 weigh in favor of applying Texas, rather than Colorado, law.  First, the "injury" from the fraudulent transfer was suffered by Billie (due to her loss of her interest in the Colorado Property) and her creditors (due to the loss of the

20

property available to satisfy their claims against her).  Second, the Feuerbachers were both Texas residents at all times relevant to this lawsuit.  Comparatively, more of Billie's creditors, including TBW Land & Cattle LLC, list a Texas mailing address.  *See* Bankruptcy Schedules D, E, and F. In fact, it appears from the record that Billie does not have any creditors in Colorado.

Third, the conduct causing the injury occurred in both states.  The Feuerbachers were Texas residents at the time of the marital partitions (which, based on the notary seal, appear to have been signed in Texas), and Billie filed her Chapter 7 Bankruptcy Petition in Texas. Nonetheless, the Quit Claim Deed was recorded in the real property records of Mineral County, Colorado.  Fourth, the relationship between the parties is centered in Texas.  As noted previously, the Feuerbachers resided in Texas at all times relevant to this case.  On balance, therefore, the factors set forth in § 145 militate in favor of applying Texas law.

An analysis of § 6 similarly supports the application of Texas law.  Here, "the basic policy at issue is the protection of creditors from fraudulent transfers."  *Mirant*, 2012 WL 919620, at *6. Because both Texas and Colorado have adopted fraudulent transfers laws, the application of either states' law would appear to advance this underlying policy.  *See* TEX. BUS. & COM. CODE § 24.005(a); COLO. REV. STAT. § 38-8-105.  For the same reasons, the factors addressing the protection of justified expectations and the certainty, predictability, and uniformity of result appear neutral.

"Turning to the needs of the interstate system, '[c]hoice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them.'"  *Mirant*, 2012 WL 919620, at *6 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. d (1971)).  Assuming these needs are met equally by the application of either

state's law, it is notable that Billie has no creditors in Colorado.  In light of this fact, it seems unlikely that Colorado would have any interest in the application of its law where, as here, its citizens would receive no benefit therefrom.  *Mirant*, 2012 WL 919620, at *7.  Finally, the ease in determination and application of the law to be applied favors Texas—the forum in which the bankruptcy and adversary proceedings were brought.  *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp.2d 742, 750 (S.D. Tex. 2009).  In short, when the court focuses on the qualitative nature of each relevant contact and the factors set forth in §§ 6 and 145, the scales tip in favor of applying Texas law.

As a consequence, Feuerbacher's assertion that the bankruptcy court erroneously awarded the Trustee attorney's fees pursuant to TUFTA (which provides for attorney's fees) rather than Colorado's Uniform Fraudulent Transfer Act (which does not) is without merit.  *See* TEX. BUS. & COM. CODE § 21.013 ("In any proceeding in this chapter, the court may award costs and reasonable attorney's fees as are equitable and just."); *accord In re IFS Fin. Corp.*, No. 02-39553-H1-7, 2010 WL 1992579, at *3 (S.D. Tex. May 18, 2010) ("'This provision of TUFTA gives the trial court the sound discretion to award attorney's fees based on the evidence.'") (quoting *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.)).  Further, because Feuerbacher's contention that the bankruptcy court's failure to segregate the fee award constituted reversible error is based entirely on the same incorrect premise—that Colorado law applies—reversal on this ground is similarly unwarranted.

C.    Avoidance of the Transfer of the Colorado Property

Feuerbacher next challenges the bankruptcy court's avoidance of the Colorado Property transfer.  Specifically, he argues that, because the application of Colorado law is proper with

respect to the Trustee's § 544(b) action, the bankruptcy court's avoidance of the transfer of that property based on Texas law is erroneous.  As discussed in Section II.B. *supra*, the bankruptcy court correctly applied Texas law to the Trustee's § 544(b) claim.  Thus, reversal of the § 544(b) claim on that ground is not appropriate.  As a result, the court need not address the Trustee's alternative argument that the subsequent sale of the Colorado Property renders this issue equitably moot.  *See In re ASARCO, LLC*, 441 B.R. 813, 833 n.24 (S.D. Tex. 2010) (declining to decide question of equitable mootness where the bankruptcy court was affirmed on other grounds).

> D.   Avoidance Under 11 U.S.C. §§ 548 and 544

In his last issue on appeal, Feuerbacher contends that the bankruptcy court erred in finding that "[b]oth transfers were avoidable as 'actual' fraudulent transfers under Section 548 of the Bankruptcy Code and TUFTA because Billie made the transfers with the actual intent to hinder, delay, or defraud one or more of her creditors."  The Trustee counters that sufficient evidence exists to support this finding and, in any event, the bankruptcy court's alternative finding that both transfers were constructively fraudulent under 11 U.S.C. §§ 548(a)(1)(B) and 544(b), serve as independent grounds for avoiding the transfers.  The court agrees.  As pointed out by the Trustee, Feuerbacher challenges the bankruptcy court's conclusion as to actual fraud *only*.  He does not appear to appeal the bankruptcy court's avoidance of the transfer of both properties as *constructively* fraudulent under § 548(a)(1)(B) or TUFTA.  In any event, as discussed in Sections II.C.1. and II.C.2. *infra*, the evidence submitted supports the conclusion that both transfers were avoidable as constructively and actually fraudulent.

Section 548 of the Bankruptcy Code allows a bankruptcy trustee to avoid the fraudulent transfer of assets the debtor made within two years before filing for bankruptcy.  11 U.S.C.

§ 548(a); *accord In re Laughlin*, 602 F.3d 417, 422 n.3 (5th Cir. 2010); *In re Erlewine*, 349 F.3d 205, 208 (5th Cir. 2003). Under § 548(a)(1), a trustee can avoid a transfer of property or an interest in property as "actually fraudulent" if the debtor made the transfer with the "actual intent to hinder, delay, or defraud" any creditor. 11 U.S.C. § 548(a)(1)(A); *accord In re Am. Hous. Found.*, No. 09-20232, 2011 WL 4625349, at *21 (Bankr. N.D. Tex. Sept. 30, 2011); *In re Caremerica, Inc.*, 409 B.R. 759, 766 (Bankr. E.D.N.C. 2009). A bankruptcy trustee can also avoid such a transfer as "constructively fraudulent" if the debtor received "less than reasonably equivalent value in exchange for the transfer" and the debtor was insolvent at the time of the transfer. 11 U.S.C. § 548(a)(1)(B); *accord In re Am. Hous. Found.*, 2011 WL 4625349, at *21; *In re Caremerica, Inc.*, 409 B.R. at 766; *In re Alcazar*, No. 07-11667, 2008 WL 1767006, at *2 (Bankr. E.D. La. Apr. 14, 2008).

Section 544(b) of the Bankruptcy Code allows a bankruptcy trustee to "'avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowable] unsecured claim.'" *In re IFS Fin. Corp.*, 669 F.3d 255, 261 (5th Cir. 2012) (quoting 11 U.S.C. § 544(b)(1)). This statute "allows a trustee in bankruptcy to step into the shoes of a creditor holding an unsecured claim and void transfers that are voidable under applicable state law." *In re Cyrus II P'ship*, 413 B.R. at 619; *accord In re IFS Fin. Corp.*, 669 F.3d at 261 n.3.

Fraudulent transfers under TUFTA "are divided into two types:  actual fraudulent transfers, § 24.005(a)(1), and constructive fraudulent transfers, [§ 24.006]." *In re Pace*, 456 B.R. 253, 266 (Bankr. W.D. Tex. 2011). Like § 548 of the Bankruptcy Code, a transfer is actually fraudulent under TUFTA if it was made "with actual intent to hinder, delay, or defraud any

creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1).  Under § 24.006, a debtor's transfer is constructively fraudulent where "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time." TEX. BUS. & COM. CODE § 24.006.

"For the purposes of [§ 548], a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition." 11 U.S.C. § 548(d)(1).  Under TUFTA, a transfer occurs "[w]hen the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." TEX. BUS. & COM. CODE § 24.007(1)(A).

Stated differently, this kind of "transfer" cannot occur until the conveyance document is recorded in the property records of the county where the property is located.  *See* TEX. PROP. CODE § 13.001(a) (an unrecorded conveyance is void as to a subsequent purchaser for valuable consideration without notice); COLO. REV. STAT. ANN. § 38-35-109 ("No unrecorded instrument or document shall be valid against any person with any kind of rights in or to such real property who first records and those holding rights under such person, except between the parties thereto and against those having notice thereof prior to acquisition of such rights."); TEX. FAM. CODE § 4.106(b) (a partition agreement for real property is constructive notice to a good faith purchaser for value only if the instrument is acknowledged and recorded in the county where the real

25

property is located); *see also United States v. Commercial Tech., Inc.*, 354 F.3d 378, 386 (5th Cir. 2003) (property was "transferred" when the warranty deed and purchase agreement were recorded); *In re Pernie Bailey Drilling Co., Inc.*, 131 B.R. 53, 57 (Bankr. W.D. La. 1991) ("transfer" was deemed to have occurred on the date the debtor's assignment was recorded, as that was the date it became valid and perfected as to third parties); *In re Harms*, 7 B.R. 398, 400 (Bankr. D. Colo. 1980) ("[A] bona fide purchaser of realty who records his interest will cut off the rights of a previous transferee who fails to record."); *Corpus v. Arriaga*, 294 S.W.3d 629, 365-36 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding that a "transfer" of real property is made when the deed is recorded for purposes of TUFTA).

Here, because the Feuerbachers did not record their partition agreements until approximately three weeks before Billie filed her Chapter 7 petition, the bankruptcy court correctly concluded that the "transfers" of those properties occurred on the dates of their respective recordings (September 16, 2009, for the Mills County Property and September 23, 2009, for the Colorado Property). *See Commercial Tech., Inc.*, 354 F.3d at 386; *In re Pernie Bailey Drilling Co., Inc.*, 131 B.R. at 57; *Corpus*, 294 S.W.3d at 365-36. Moreover, Feuerbacher's assertion that he recorded these interests in "good faith reliance on fully informed counselor's advice" does not change this result, as he does not identify record evidence suggesting who recorded the conveyance documents or what legal advice he purportedly received.

Despite the fact that the Feuerbachers entered into the partition agreements in 2003, Billie had a joint community property interest in the Mills County Property and the Colorado Property at the time of the transfers (*i.e.*, the dates the partition agreements were recorded). To explain, "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be

community property." TEX. FAM. CODE § 3.003(a).  "The degree of proof necessary to establish

that property is separate property is clear and convincing evidence." TEX. FAM. CODE § 3.003(b).

In determining that the Mills County and Colorado Properties were jointly managed community

property, the bankruptcy court reasoned that property titled in the name of both spouses cannot

be separately managed by one spouse, because one spouse cannot convey title without the other.

*See Owen v. Porter*, 796 S.W.2d 265, 268 (Tex. App.—San Antonio 1990, no pet.).  The Mills

County and Colorado Properties were titled jointly until Billie transferred them to her husband on

September 16, 2009, and September 23, 2009, respectively.  Further, Billie and Feuerbacher were

jointly liable on the promissory notes and deeds of trust evidencing the mortgage loans on both

the Mills County and the Colorado Properties. *See Newberry v. Newberry*, 351 S.W.3d 552, 559

(Tex. App.—El Paso 2011, no pet.) ("An asset purchased on borrowed funds is presumptively

community in character."); *Jurek v. Couch-Jurek*, 296 S.W.3d 864, 874 (Tex. App.—El Paso

2009, no pet.) (stating that property purchased on community credit "is community property

unless there is an express agreement on the part of the lender to look solely to the separate estate

of the purchasing spouse for satisfaction of the indebtedness") (citing *Glover v. Henry*, 749

S.W.2d 502, 503 (Tex. App.—Eastland 1988, no writ)).

Feuerbacher's assertions that he used his separate property to purchase the Mills County

Property and that Billie made no deposits into accounts from which Feuerbacher paid for the

properties is not supported by the record, which clearly shows that payments on mortgages for

both properties were made from accounts held jointly by the Feuerbachers.  Funds held in a

married couple's joint account are generally community property.  *See Brooks v. Sherry Lane

Nat'l Bank*, 788 S.W.2d 874, 877 (Tex. App.—Dallas 1990, no pet.) (funds in joint accounts did

not qualify as wife's special community or separate property where both spouses were signatories on the accounts and both had the right to remove funds). These payments support the conclusion that neither of the properties was Feuerbacher's separately managed community property before the transfers. In his original brief, Feuerbacher did not challenge this determination. To the extent it is challenged in Feuerbacher's reply brief, such contention is waived. *See Cavazos v. JP Morgan Chase Bank Nat'l Ass'n*, 388 F. App'x 398, 399 (5th Cir. 2010) (arguments raised for the first time in a reply brief are waived).[6] Under these circumstances, the court agrees with the bankruptcy court's conclusion that Feuerbacher did not rebut the community property presumption with clear and convincing evidence in this case.[7] *See* TEX. FAM. CODE § 3.003(b).

_____

[6] Before the bankruptcy court, Feuerbacher argued that the Mills County and Colorado Properties were his separate property and attempted to trace the origins of these properties back to his separate property. Toward that end, he referenced several exhibits in the Joint Pretrial Order to support various propositions. Many of Feuerbacher's assertions, however, are not clearly supported by the evidence cited. For example, Feuerbacher points to two checks he claims came from an account funded solely by him and directs the court to "Exhibit 8" and "Exhibit 9." Despite his references to numerical exhibits, Feuerbacher's trial exhibits are arranged and tabbed alphabetically. Further, exhibits H, I, and J do not contain copies of the checks referenced, and the Trustee's exhibits also do not contain copies of these checks. Feuerbacher's argument in the Joint Pretrial Order is replete with inconsistencies such as this, making a review of this case nearly impossible and certainly impracticable in any event. *See In re Kevco, Inc.*, No. 4:05-CV-691, 2006 WL 2037554, at *5 (N.D. Tex. July 18, 2006) (recognizing that a court is not required to sift through a voluminous record in search of facts supporting a litigant's argument), *aff'd*, 230 F. App'x 466 (2007).

[7] The court notes that neither party contemplated the application of Colorado law as it pertains to the marital property characterization of the Colorado Property. Indeed, in his trial brief, Exhibit B of the Joint Pretrial Order, and on appeal, Feuerbacher references only Texas law for this issue. Generally, when Texas spouses acquire out-of-state realty, the law of the situs controls the characterization inquiry. *See* Aloysius A. Leopold, 38 Texas Practice Series TM, Marital Property and Homesteads § 8.20 (2011). Nevertheless, "the law of the situs must be pleaded and proved or recognized by judicial notice, or the court will presume the law of situs is the same as the law in Texas." *Id.* (citing *Brock v. Brock*, 586 S.W.2d 927, 931 (Tex. Civ. App.—El Paso 1979, no writ); *see In re Soporex*, 446 B.R. at 765 (collecting cases).

Regardless, real property purchased in a common law state with funds earned in a community state is generally characterized as community property. *In re Eisner*, No. 05-44474, 2007 WL 2479654, at *6 (Bankr. E.D. Tex. Aug. 28, 2007) (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 259).

1.   <u>Constructive Fraud</u>

As set forth above, under both the Bankruptcy Code and TUFTA, the Trustee may avoid Billie's transfers of the Mills County and Colorado Properties as constructively fraudulent if she received less than reasonably equivalent value in exchange for the transfers and was insolvent at the time. *See* 11 U.S.C. § 548(a)(1)(B); Tex. Bus. & Com. Code § 24.006(a). According to Billie's bankruptcy schedules, on October 6, 2009, the date she filed for bankruptcy, she had assets totaling $366,305.00. In addition, her transfers during the ninety days preceding her bankruptcy filing totaled less than $50,000.00. In light of the $4.2 million judgment rendered against her on May 6, 2009, it is clear that Billie had liabilities far exceeding her assets and, therefore, was insolvent. *See* 11 U.S.C. § 101(32)(a) (a person is insolvent if his or her debts are greater than a fair valuation of all of his or her property, excluding property transferred, concealed, or removed with intent to hinder, delay, or defraud creditors); Tex. Bus. & Com. Code § 24.003 (a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation"); *accord In re Pace*, 456 B.R. at 273.

Additionally, Billie received far less than reasonably equivalent value in exchange for the transfers. On September 16, 2009, the equity value of the Mills County Property was $367,693.40, and on September 23, 2009, the equity value of the Colorado Property was $74,836.31. Further, as of those dates, the equity value of the Homestead Property was approximately $1,700.00. Thus, by recording the marital partition agreements, Billie transferred

---

Indeed, "[c]ommunity property does not lose its community character merely by being invested in real property located outside of Texas, even if the community property is invested in real property located in a state that is not a community property state." *Id.* (citing *Sillero v. Sillero*, No. 05-44474, 2005 WL 1529422, at *2 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Because the assets used to purchase both properties were presumptively community, the properties themselves are also the community property of the Feuerbachers.

away more than $400,000.00 in equity and received property worth less than $2,000.00 in return. Because Billie received less than reasonably equivalent value in exchange for the Mills County and Colorado Properties and was insolvent at the time, the bankruptcy court correctly determined that both transfers were avoidable as constructively fraudulent.  *See* 11 U.S.C. § 548(a)(1)(B); TEX. BUS. & COM. CODE § 24.006(a).  Constructive fraud alone is a sufficient theory upon which to affirm the bankruptcy court.  *See In re TransTexas Gas Corp.*, 597 F.3d 298, 304 (5th Cir. 2010) (stating that an avoidable fraudulent transfer requires *either* the actual intent to hinder, delay, or defraud a creditor *or* an insolvent debtor who received less than reasonably equivalent value in exchange for an obligation); *In re Front Range Pipe & Supply, Inc.*, No. 07-CV-01854, 2009 WL 6669482, at *3 (D. Colo. Oct. 26, 2009); *In re Bossart*, No. 05-34015, 2007 WL 4561300, at *8 (S.D. Tex. Dec. 21, 2007).

2.    Actual Fraud

In any event, avoidance of both transfers under a theory of actual fraud pursuant to the Bankruptcy Code and TUFTA was proper.  Under 11 U.S.C. § 548(a)(1)(A) and TEX. BUS. & COM. CODE § 24.005(a)(1) (brought pursuant to 11 U.S.C. § 544(b)), a conveyance is deemed actually fraudulent if the debtor transferred the property at issue with the "actual intent to hinder, delay, or defraud" any creditor.  11 U.S.C. § 548(a)(1)(A); TEX. BUS. & COM. CODE § 24.005(a)(1).  Courts construing the phrase "hinder, delay, or defraud" have concluded that because it has been written in the disjunctive, any one of the three states of mind identified is sufficient.  *See In re Stanton*, 457 B.R. 80, 93-94 (Bankr. D. Nev. 2011); *Cullinan Assocs., Inc. v. Clements*, 205 B.R. 377, 381 (W.D. Va. 1995).  *But see In re Addison*, 540 F.3d 805, 812-813 (8th Cir. 2008).

30

"'Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish [the debtor's] fraudulent intent.'" *In re Soza,* 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Roland v. United States*, 838 F.2d 1400, 1402-03 (5th Cir. 1988)).   The Fifth Circuit has identified the following "badges of fraud," which tend to show intent to hinder, delay, or defraud under § 548(a)(1)(A):

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Soza*, 542 F.3d at 1067 (citing *In re Chastant*, 873 F.2d 89, 91 (5th Cir. 1989) (quoting *In re Schmit*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

Similarly, in determining a transferor's actual intent to hinder, delay, or defraud under § 24.005(b) of TUFTA, consideration is given to whether:

(1)     the transfer or obligation was to an insider;
(2)     the debtor retained possession or control of the property transferred after the transfer;
(3)     the transfer or obligation was concealed;
(4)     before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5)     the transfer was of substantially all the debtor's assets;
(6)     the debtor absconded;
(7)     the debtor removed or concealed assets;
(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10)     the transfer occurred shortly before or shortly after a substantial debt was incurred; and

31

(11)   the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).  "Not all, or even a majority, of the 'badges of fraud' must exist to find actual fraud."  *In re Soza*, 542 F.3d at 1067.  Hence, "'[w]hen several of these indicia of fraud are found, they can be a proper basis for an inference of fraud.'"  *Id.* (quoting *Roland*, 838 F.2d at 1403).

As found by the bankruptcy court, the transfers of the Mills County and Colorado Properties are tainted by several clear indicia of fraud.  First, by jointly holding title to the properties, making payments from their joint bank account, and refinancing the properties together, the Feuerbachers held themselves out to the world as joint owners of their Homestead Property, the Mills County Property, and the Colorado Property.  The couple lived together at the Homestead Property following the execution of the Release and Conveyance Agreements.  By delaying the recording of these documents until mere weeks before Billie filed for bankruptcy, it appears that the Feuerbachers hid the agreements from their creditors.

In addition, the transfers of Billie's interests in the Mills County and Colorado Properties on September 16, 2009, and September 23, 2009, were made to her husband, an insider, less than three weeks before the petition date.  *See* 11 U.S.C. § 101(31)(A)(i); TEX. BUS. & COM. CODE § 24.002(7)(A)(i) and (11).  As noted, although Feuerbacher insists that the transfers were made upon the advice and counsel of attorneys, the record is devoid of such evidence.

Moreover, at the time she filed for bankruptcy protection, Billie had a judgment against her for approximately $4.2 million, three other lawsuits were pending against her, and she was grossly insolvent.  Further, the transfers left Billie with virtually no non-exempt assets except, possibly, a small sum that she completely exhausted in the weeks between the time of the transfers

32

and her bankruptcy filing.  After considering the "badges of fraud" enunciated by the Fifth Circuit in *In re Soza* as well as the factors listed in TEX. BUS. & COM. CODE § 24.005(b), it is apparent that the bankruptcy court correctly determined that Billie "made the transfers of the Mills County and Colorado Properties with the actual intent to hinder, delay, or defraud her creditors."  In short, reversal on this basis is not warranted.

III.   Conclusion

Consistent with the foregoing analysis, the bankruptcy court had the constitutional authority to enter final judgment in this adversary proceeding.  Alternatively, the court adopts the bankruptcy court's opinion in its entirety, as it properly applied Texas law to the Trustee's claim brought pursuant to 11 U.S.C. § 544(b) and correctly ruled in his favor as to the avoidance claims under 11 U.S.C. §§ 548 and 544(b) and TUFTA.  Therefore, the judgment of the bankruptcy court is AFFIRMED, and the Clerk of Court is directed to close this case.

SIGNED at Beaumont, Texas, this 29th day of March, 2012.

*Marcia A. Crone*

MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE